932 F.2d 765
 59 USLW 2689
 Nell A. CAMMACK; Genie Lucas; Douglas Paul Root; Carolyn
L. Stapleton; Michele Wallace, Plaintiffs-Appellants,
v.
John W. WAIHEE, in his capacity as Governor of the State of
Hawaii; Alfred Lardizabal, in his capacity as Director of
Personnel Services of the State of Hawaii; Frank F. Fasi,
in his capacity as Mayor of the City & County of Honolulu;
Jeremy Harris, in his capacity as Managing Director of the
City & County of Honolulu; Loretta K. Fukuda, in her
capacity as the Director of Civil Service of the City &
County of Honolulu; United Public Workers, Local 646,
AFSCME; Hawaii State Teachers Association; University of
Hawaii Professional Assembly; Hawaii Fire Fighters
Association, Local 1463, IAFF; State of Hawaii Organization
of Police Officers, Defendants-Appellees.
 No. 87-15073.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 14, 1988.
Decided April 30, 1991.
As Amended Aug. 9, 1991.
 
 Kirk Cashmere and Karen A. Essene, American Civil Liberties Union, Honolulu, Hawaii, for plaintiffs-appellants.
 Steven S. Michaels, Deputy Atty. Gen., Honolulu, Hawaii, for defendant-appellee, State of Hawaii.
 Danny J. Vasconcellos, Honolulu, Hawaii, for defendant-appellee United Public Workers, Local 646, AFSCME and Hawaii Government Employees' Ass'n, Local 152, AFSCME.
 Vernon Yu and T. Anthony Gill, Gill, Park, Park & Kim, Honolulu, Hawaii, for defendant-appellee Hawaii State Teachers Ass'n and University of Hawaii Professional Assembly.
 Appeal from the United States District Court for the District of Hawaii.
 Before D.W. NELSON, O'SCANNLAIN and TROTT, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We are asked to decide the constitutionality of a Hawaii statute declaring Good Friday a state holiday. Our task is not as simple as it might appear.
 
 
 2
 * In 1941, the Territory of Hawaii enacted a bill declaring that Good Friday, the Friday preceding Easter Sunday, shall be "set apart and established as [a] territorial holiday[ ]." Act effective Apr. 30, 1941, No. A-1, Sec. 1, 1941 Haw.Sess.Laws 1. Upon statehood, the legislation was ratified and now appears as part of Hawaii Revised Statutes section 8-1, which designates Hawaii state holidays.[1] Good Friday has thus been a public holiday in Hawaii for fifty years. Good Friday is also a public holiday in twelve other states: Delaware, Florida, Georgia, Indiana, Louisiana, Maryland, New Jersey, New Mexico, North Carolina, North Dakota, Tennessee, and Wisconsin.[2]
 
 
 3
 Hawaii's section 8-1 appropriates no funds to carry out its purposes. By providing for state holidays, however, the statute has at least the fiscal impact that many state and local government offices are closed and many state and local government employees need not report to work. Furthermore, in 1970, the Hawaii Legislature enacted a public collective bargaining law which mandated that the terms and conditions of public employment be determined through a collective bargaining process. The statute recognized that "joint decisionmaking [between public employees and their employers] is the modern way of administering government." Id. Sec. 89-1. The number and dates of paid leave days are among the mandatory subjects of collective bargaining. All collective bargaining agreements currently in effect between public employees and their employers provide for numerous paid leave days, either expressly or through incorporation of section 8-1. Good Friday is included as one such paid leave day. These collective bargaining agreements cover approximately sixty-five percent of Hawaii's public employees.
 
 II
 
 4
 Nell A. Cammack, Genie Lucas, Douglas Paul Root, Carolyn L. Stapleton, and Michele Wallace, Hawaii taxpayers and residents, filed suit under 42 U.S.C. Sec. 1983 in federal district court against the Governor of the State of Hawaii, the Mayor of the City and County of Honolulu, other officials, and public employee organizations (collectively called "government"), seeking declaratory relief and attorney fees.[3] They allege that the Hawaii statute setting apart Good Friday as a state holiday violates both the establishment clause of the first amendment of the United States Constitution and article I, section 4 of the Hawaii State Constitution.[4] Appellants also seek a declaration that the state and city collective bargaining agreements are unconstitutional to the extent that they provide for paid leave on Good Friday.
 
 
 5
 The district court granted summary judgment in favor of the government, determining that the appellants had standing to bring the action but upholding section 8-1 and the collective bargaining agreements as constitutional. See Cammack v. Waihee, 673 F.Supp. 1524 (D.Haw.1987). This appeal followed.
 
 III
 
 6
 The government contends that this court lacks jurisdiction because appellants' notice of appeal is defective and because appellants do not have standing. We examine each argument in turn.[5]
 
 
 7
 * Appellants' notice of appeal reads, in pertinent part: "Notice is hereby given that Plaintiffs above-named hereby appeal ... the final judgment...." Notice of Appeal, Cammack v. Waihee, Civil No. 87-0260 (D.Haw. Dec. 4, 1987). The compound adjective "above-named" apparently refers to the notice's caption, which states: "Nell A. Cammack, et al., Plaintiffs, vs. John Waihee, et al., Defendants." Id.
 
 
 8
 Federal Rule of Appellate Procedure 3(c) provides that a notice of appeal "shall specify the party or parties taking the appeal." In Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), the Supreme Court held that courts "may not waive the jurisdictional requirements of Rules 3 and 4, even for 'good cause shown.' " Id. at 317, 108 S.Ct. at 2409. In that case, Torres, one of sixteen plaintiffs, had inadvertently been omitted from the list of appellants in the notice of appeal. Id. at 313, 108 S.Ct. at 2407; see id. at 323, 108 S.Ct. at 2412 (Brennan, J., dissenting) (noting that the other fifteen plaintiffs were listed by name as appellants). The Court concluded that Torres had not satisfied the jurisdictional requirements for maintaining an appeal, because "he was never named or otherwise designated, however inartfully, in the notice of appeal." Id. at 317, 108 S.Ct. at 2409. The use of the term "et al." in the notice of appeal was insufficient to indicate Torres' intent to appeal, because such a vague designation would not put the appellee or court on notice that Torres was indeed an appellant. See id. at 317-18, 108 S.Ct. at 2408-10.
 
 
 9
 In a recent case tracking more closely the facts of the controversy before us, this court ruled that a bare reference to "defendants" in the body of the notice, coupled with use of "et al." in the caption, constituted sufficient notice that all defendants sought appeal of the district court's judgment.[6] See National Center for Immigrants' Rights, Inc. v. INS, 892 F.2d 814 (9th Cir.1989) (per curiam). Where no names were listed in the body of the notice, we held, the intention to include all of the group of "defendants" in the appeal was clear. See id. at 816-17. If only some of the defendants had intended to appeal, the body of the notice would likely have indicated that "certain defendants" were appealing, or would have listed the specific appellants. Id. at 817; see also Ford v. Nicks, 866 F.2d 865, 869-70 (6th Cir.1989) (use of "et al." in caption and indication that "the defendants" were appealing in the body of the notice sufficient to give notice that all defendants were appealing), overruled, Minority Employees v. Tennessee Dep't of Employment Security, 901 F.2d 1327 (6th Cir.1990) (en banc).
 
 
 10
 As in National Center for Immigrants' Rights, Inc., the notice of appeal in this case is sufficiently clear to alert the court and defendants that all plaintiffs are seeking to appeal. There is no Rule 3(c) jurisdictional bar to this appeal, and we decline the government's invitation to dismiss the appeal.[7]
 
 B
 
 11
 A more difficult question is whether the appellants have standing to maintain this action in federal court. The original complaint alleges each plaintiff to be a citizen of the State of Hawaii, a resident of the City and County of Honolulu, and a taxpayer to each of these entities. Complaint 2-3, Cammack v. Waihee, Civil No. 87-0260 (D.Haw. April 6, 1987). The complaint's allegations include the assertion that $3.4 million in state tax revenues and $850,000 in city tax revenues are expended on the holiday. See id. at 7.
 
 
 12
 The district court held that the plaintiffs had state taxpayer standing to challenge the Hawaii statute in federal court. See Cammack, 673 F.Supp. at 1527-28. The government argues that the district court erred. The district court did not reach the question of municipal taxpayer standing, but the issue is squarely presented on this record. We consider whether the plaintiffs below (and appellants here) have either state or municipal taxpayer standing to pursue this action in federal court.
 
 
 13
 * The bedrock requirement for standing is that the challenger suffer "injury." We first consider whether appellants, as state and municipal taxpayers, have properly alleged an injury sufficient to endow them with taxpayer standing to challenge the Good Friday public holiday. This requires an examination of the injury requirements which pertain to each relevant form of taxpayer standing--state and municipal.
 
 
 14
 The seminal state taxpayer standing case is Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). In that case, the Supreme Court explained that a state taxpayer has standing to challenge a state statute when the taxpayer is able to show that he " 'has sustained or is immediately in danger of sustaining some direct injury as the result of [the challenged statute's] enforcement.' " Id. at 434, 72 S.Ct. at 397 (quoting Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923) (also known as Frothingham v. Mellon )). The direct injury required by Doremus is established when the taxpayer brings a "good-faith pocketbook action"; that is, when the challenged statute involves the expenditure of state tax revenues. Hoohuli v. Ariyoshi, 741 F.2d 1169, 1178 (9th Cir.1984) (pleadings must "set forth the relationship between taxpayer, tax dollars, and the allegedly illegal government activity") (citing Doremus ); see also Reimers v. State of Oregon, 863 F.2d 630, 632 n. 4 (9th Cir.1988) (no state taxpayer standing where taxpayer does not challenge the disbursement of state funds) (citing Doremus ). However, Hoohuli, the leading case on this issue in the circuit, does not require that the taxpayer prove that her tax burden will be lightened by elimination of the questioned expenditure. See Minnesota Fed'n of Teachers v. Randall, 891 F.2d 1354, 1357 (8th Cir.1989) (following Hoohuli ); cf. District of Columbia Common Cause v. District of Columbia, 858 F.2d 1, 5 (D.C.Cir.1988) (injury redressed by elimination of expenditure, rather than by decrease in taxation).
 
 
 15
 This court has not previously ruled on the different injury requirements, if any, for municipal taxpayer standing.[8] It seems to us, however, that the Doremus requirement of a pocketbook injury applies to municipal taxpayer standing as well as to state taxpayer standing. Doremus itself, while treating the specific question of state taxpayer standing, quoted a municipal taxpayer standing case for the proposition that a direct injury was necessary. See Doremus, 342 U.S. at 434, 72 S.Ct. at 397 (quoting Massachusetts (Frothingham), 262 U.S. at 448, 43 S.Ct. at 598). The Court in Doremus then harmonized its announced rule with a school district taxpayer case. See id. (discussing Everson v. Board of Educ., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (assuming standing for school district taxpayer challenge of school board expenditures for transportation of parochial school students)). Subsequent cases have made clear that municipal taxpayer standing is only available when there is an expenditure of municipal funds challenged; courts in other circuits often have applied Doremus-like language to express this rule. See, e.g., District of Columbia Common Cause, 858 F.2d at 4 (explicitly applying the Doremus rule to municipal taxpayers); Freedom From Religion Found., Inc. v. Zielke, 845 F.2d 1463, 1469-70 (7th Cir.1988) (municipal taxpayers have standing to challenge the improper use of tax revenues but no standing where there has been no expenditure of city funds); Hawley v. City of Cleveland, 773 F.2d 736, 741-42 (6th Cir.1985) (municipal taxpayers may enjoin improper municipal expenditures), cert. denied, 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986); Donnelly v. Lynch, 691 F.2d 1029, 1031 (1st Cir.1982) ("municipal taxpayers ... have standing to sue to challenge allegedly unconstitutional use of their tax dollars"), rev'd on other grounds, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). In fact, even those who have taken a dimmer view of the breadth of state taxpayer standing than this court have recognized that municipal taxpayer standing requires no more injury than an allegedly improper municipal expenditure. See, e.g., ASARCO, Inc. v. Kadish, 490 U.S. 605, 612, 109 S.Ct. 2037, 2042, 104 L.Ed.2d 696 (1989) (Kennedy, J.) (distinguishing the standing requirements for municipal taxpayers from those for state taxpayers, who must have a "direct injury" like that required of federal taxpayers)[9]; Taub v. Commonwealth of Kentucky, 842 F.2d 912, 917-19 (6th Cir.) (rejecting Hoohuli and restricting state taxpayer standing in non-establishment clause cases to that available to federal taxpayers, while leaving the municipal taxpayer standing rules unchanged), cert. denied, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988); Donnelly, 691 F.2d at 1031 (the restrictive view of federal taxpayer standing may apply to state taxpayer standing as well, but not to municipal taxpayer standing). Thus, we conclude that municipal taxpayer standing simply requires the "injury" of an allegedly improper expenditure of municipal funds, and in this way mirrors our threshold for state taxpayer standing.
 
 
 16
 Our next inquiry is whether appellants have, in fact, established the requisite "pocketbook" injury. In Hoohuli, state taxpayers challenged an Hawaiian program which was designed to disburse benefits to state residents who were descendants of the aboriginal inhabitants of the islands. The program, established pursuant to an amendment to the state constitution, involved the expenditure of tax dollars through an administrative division (the Office of Hawaiian Affairs) created to implement the amendment. Hoohuli, 741 F.2d at 1172. The taxpayers protested the " 'appropriating, transferring, and spending.... of taxpayers' money from the General Fund of the State Treasury....' " Id. at 1180. The taxpayers alleged that the program saddled them with an additional tax burden and that the revenues would be unlawfully spent to support the "class" of Native Hawaiians. Id. The court found the case to fit the description of a "good-faith pocketbook action" under Doremus. Id.
 
 
 17
 Similarly, appellants' allegations satisfy the Doremus pocketbook injury requirement for standing. They have set forth their status as state and municipal taxpayers and specifically have stated the amount of funds appropriated and allegedly spent by the taxing governmental entities as a result of the Good Friday holiday.
 
 
 18
 The government contends that taxpayers as such cannot have standing to challenge section 8-1 because the bare declaration of Good Friday as a state holiday does not, standing alone, involve any expenditure of tax revenues. This argument cannot prevail. Legislative enactments are not the only government activity which the taxpayer may have standing to challenge. See id. (contrasting state taxpayer's ability to challenge executive conduct with federal taxpayer's) (quoting Public Citizen, Inc. v. Simon, 539 F.2d 211, 218 n. 30 (D.C.Cir.1976)); see also Bowen v. Kendrick, 487 U.S. 589, 618-20, 108 S.Ct. 2562, 2579-80, 101 L.Ed.2d 520 (1988) (federal taxpayers have standing to challenge executive or administrative grants made pursuant to Congress' taxing and spending powers); Everson v. Board of Educ., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (assuming without question that school district taxpayer has standing to challenge school board reimbursement of parents for public transportation fares incurred by their children traveling to parochial schools); District of Columbia Common Cause, 858 F.2d at 8-9 (municipal taxpayers may challenge District of Columbia's expenditure of public funds to influence the outcome of an initiative); Hawley, 773 F.2d at 741-42 (municipal taxpayers may challenge city lease of airport terminal space to church where the lease agreement could have a detrimental impact on the public fisc). The complaint asserts that section 8-1 proclaims a state holiday in violation of the federal and state constitutions, and that state and municipal tax revenues fund the paid holiday for government employees. The collective bargaining agreements entered into by the government incorporate the challenged statute. In our view, this allegation identifies an expenditure of public funds sufficiently related to appellants' constitutional claim.
 
 2
 
 19
 Having recognized an injury allegedly suffered by the taxpayer, we now consider the causation and redressability requirement. Causation and redressability are essentially identical requirements where the remedy is an order to desist. See Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984) (discussing elements of standing); District of Columbia Common Cause, 858 F.2d at 5 (considering municipal taxpayer standing).
 
 
 20
 The district court impliedly found that appellants have established causation and redressability. Cammack, 673 F.Supp. at 1528 (determining that the injury would be remedied by a favorable decision). Appellants' asserted injury is the impermissible advancement of religion effected by the recognition of Good Friday as a state holiday and the expenditure of tax revenues to public employees for not working on that day. "If this court strikes down Hawaii Rev.Stat. Sec. 8-1 as constitutionally flawed, the alleged entanglement between the State of Hawaii and religion would be terminated." Id. Ceasing the government's expenditure of public monies on the holiday could be accomplished by voiding some portions of the collective bargaining agreements on public policy grounds, or at the least by requiring that the agreements be revised in the next round of contract negotiations. Id. See generally District of Columbia Common Cause, 858 F.2d at 5 ("The injury--misuse of public funds--is redressed by an order prohibiting the expenditure.") (citations omitted).
 
 3
 
 21
 In summary, we conclude that appellants have standing as both state and municipal taxpayers to challenge the expenditure of tax revenues on paid leave days for the Good Friday holiday. Appellants have asserted the necessary injury--actual expenditure of tax dollars--and that a successful challenge would remedy the injury. This notion of standing is consistent with the traditional judicial hospitality extended to establishment clause challenges by taxpayers generally. See, e.g., School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 380 n. 5, 105 S.Ct. 3216, 3220 n. 5, 87 L.Ed.2d 267 (1985) (listing cases involving establishment clause challenges by state taxpayers to programs aiding nonpublic schools); Fletcher, The Structure of Standing, 98 Yale L.J. 221, 267-72 (1988) (describing, with some skepticism, the limited establishment clause exception to the general rule against federal taxpayer standing).[10]
 
 IV
 
 22
 The first amendment provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. The establishment clause is made applicable to the states by the fourteenth amendment. Everson, 330 U.S. at 5, 67 S.Ct. at 506.
 
 
 23
 Recently the Supreme Court stated that it "has come to understand the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization." County of Allegheny v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472 (1989). The establishment clause, however, "permits government some latitude in recognizing and accommodating the central role religion plays in our society." Id. 109 S.Ct. at 3135 (Kennedy, J., concurring and dissenting) (citing Lynch v. Donnelly, 465 U.S. 668, 678, 104 S.Ct. 1355, 1361-62, 79 L.Ed.2d 604 (1984)).
 
 
 24
 * The government argues that this case is controlled by Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). In Marsh, the Court upheld the Nebraska state legislature's practice of opening its daily sessions with a prayer from an official chaplain, who was compensated for his services from the state treasury. The Court explained that legislative prayer was "deeply embedded in the history and tradition of this country[,] [f]rom colonial times through the founding of the Republic and ever since." 463 U.S. at 786, 103 S.Ct. at 3333.
 
 
 25
 Hawaii's recognition of Good Friday stems back to its days as a territory; the holiday has been celebrated for longer than Hawaii has even been a state. Nonetheless, it cannot be said that the Good Friday holiday is as deeply embedded in the fabric of the state as was legislative prayer in Marsh. We are reluctant to extend a ruling explicitly based upon the "unique history" surrounding legislative prayer, id. at 791, 103 S.Ct. at 3335-36, to such a different factual setting. As the Court noted recently, the impact of the activities challenged in Marsh were largely confined to the internal workings of a state legislature. See County of Allegheny, 109 S.Ct. at 3106 n. 52. In contrast, a public holiday can affect the entire populace. We reject the government's contention that Marsh controls the disposition of this case.B
 
 
 26
 Although the Supreme Court has rejected any absolute approach in applying the establishment clause, it has generally relied upon the test first enunciated in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Mueller v. Allen, 463 U.S. 388, 394, 103 S.Ct. 3062, 3066-67, 77 L.Ed.2d 721 (1983); accord Board of Educ. v. Mergens, --- U.S. ----, 110 S.Ct. 2356, 2370, 110 L.Ed.2d 191 (1990) (plurality opinion).[11]
 
 In Lemon, the Court stated:
 
 27
 Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."
 
 
 28
 Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111 (quotation and citation omitted). The challenged statute must satisfy all three prongs of the Lemon test to comport with the establishment clause. Edwards v. Aguillard, 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).
 
 
 29
 * The first prong of the Lemon test requires that the statute at issue have "a secular legislative purpose." Lemon, 403 U.S. at 612, 91 S.Ct. at 2111. Generally, in applying this prong, the Supreme Court has considered whether the purpose of the legislation was to endorse religion. County of Allegheny, 109 S.Ct. at 3100. Government endorsement of religion has been found when the government conveys or attempts to convey a message that a particular religious belief is favored or preferred, or when it promotes " 'one religion or religious theory against another or even against the militant opposite.' " Id. 109 S.Ct. at 3101 (quoting Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) (striking down statute prohibiting teaching evolution)). In County of Allegheny, the Court reiterated that it "squarely rejects any notion that this Court will tolerate some government endorsement of religion." Id. 109 S.Ct. at 3102 (citing Lynch, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring)).
 
 
 30
 * The purpose prong is clearly violated when there is no legitimate secular purpose for the legislation. See, e.g., Edwards, 482 U.S. at 585-89, 107 S.Ct. at 2578-81 (striking down a statute forbidding the teaching of evolution in public schools without accompanying instruction in "creation science"); Wallace v. Jaffree, 472 U.S. 38, 56-60, 105 S.Ct. 2479, 2489-92, 86 L.Ed.2d 29 (1985) (striking down a statute mandating a period of silence in public schools for meditation or voluntary prayer). If the Court can describe the "actual purpose" of the act as religious, due to an absence of a sincerely held, legitimate secular purpose, then the legislation must fall. See id. at 56, 105 S.Ct. at 2489-90 (quoting Lynch, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring)) (stating "actual purpose" test).
 
 
 31
 When there are both religious and legitimate, sincere secular purposes motivating legislation, it appears that the existence of the secular purpose will satisfy the first Lemon prong. See id. ("[N]o consideration of the second or third criteria is necessary if a statute does not have a clearly secular purpose. For even though a statute that is motivated in part by a religious purpose may satisfy the first criterion, ... the First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion.") (citations omitted, emphasis added). In Lynch v. Donnelly, the Court noted that the city of Pawtucket had "a" secular purpose for its creche display, and therefore the purpose prong was satisfied. See 465 U.S. at 681, 104 S.Ct. at 1363. The Court rejected the argument that the government's purpose must be entirely secular. See id. n. 6. ("Were the test that if the government must have 'exclusively secular' objectives, much of the conduct and legislation this Court has approved in the past would have been invalidated.").
 
 
 32
 The Supreme Court most recently examined the secular purpose prong of the Lemon test in Bowen v. Kendrick, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). In that case, the Court upheld the Adolescent Family Life Act, which permitted federal grant money to be awarded to organizations, including religious organizations, providing care to pregnant adolescents or adolescent parents. The Court stated that a statute will fail the purpose prong "only if it is motivated wholly by an impermissible purpose." Id. at 602, 108 S.Ct. at 2570. The Court observed that the challenged statute appeared to be "motivated primarily, if not entirely, by a legitimate secular purpose." See id. Thus, it was indisputable that "religious concerns were not the sole motivation behind the Act" and it could not be said that the Act "lacks a legitimate secular purpose." See id. at 602-03, 108 S.Ct. at 2570-71 (emphasis added). Looking beyond the face of the statute, the Court concluded that "the parts of the statute to which appellees object were also motivated by other, entirely legitimate secular concerns." See id. at 603, 108 S.Ct. at 2571 (emphasis added). Because there were legitimate secular purposes, it could not be said that Congress' " 'actual purpose' ... was one of 'endorsing religion.' " See id. (quoting Edwards ).[12]
 
 
 33
 In reviewing a challenged statute for a secular purpose, we must be "reluctant to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute." Mueller, 463 U.S. at 394-95, 103 S.Ct. at 3066-67; see also Note, The Transfiguration of the Lemon Test: Church and State Reign Supreme in Bowen v. Kendrick, 32 Ariz.L.Rev. 365, 369-71 (1990) (describing Supreme Court's reluctance to deem legislation violative of the first prong of the Lemon test in the face of a plausible legislative purpose); id. at 385 ("Any avowed legislative purpose will be valid, even if it coincides with a purely sectarian [enterprise]."). The statement of such purpose, however, must be sincere and not a sham. Edwards, 482 U.S. at 586-87, 107 S.Ct. at 2579-80; see also Kendrick, 487 U.S. at 604, 108 S.Ct. at 2571-72 (quoting Edwards ) (stating that Congress' expressed purposes were sincere). In determining the legislative purpose, courts may consider "the statute on its face, its legislative history, or its interpretation by a responsible administrative agency." Edwards, 482 U.S. at 594, 107 S.Ct. at 2583. Courts may also consider the historical context of the statute and the specific sequence of events leading to the passage of the statute. Id. at 595, 107 S.Ct. at 2583-84.[13]b
 
 
 34
 Given this guidance for the appropriate application of the purpose prong of the Lemon test, we turn to the facts of this case. The legislative history of section 8-1 and its predecessors informs us as to its purpose.
 
 
 35
 An examination of the legislative history surrounding the 1941 bill, which ultimately became law, and the earlier bills, which failed to establish a Good Friday holiday, demonstrates that the primary concern motivating selection of the holiday was simply timing. For example, the 1941 bill provided for the creation of two new holidays, Lincoln's Birthday and Good Friday. It is clear from the Senate Standing Committee report accompanying the bill that the committee was most interested in the timing of the proposed new holiday:
 
 
 36
 This bill designs to add Lincoln's Birthday and Good Friday to the list of territorial holidays.
 
 
 37
 Your committee feels that Good Friday should be set aside as a legal holiday but feels that, inasmuch as Washington's Birthday is a legal holiday and falls within the short month of February, to have another holiday within that month would be inadvisable.
 
 
 38
 Haw.Sen.Stand.Comm.Rep. No. 296 (H. Bill No. 154), reprinted in 1941 Haw.Sen.J. 710.
 
 
 39
 Nothing in the legislative history concerning the 1941 bill suggests a religious motivation for its ultimate passage. Indeed, the legislature's approval of both proposed holidays and the governor's expressed opposition, because "the holidays were getting a bit thick about that time of year," betray no particular interest in the secular or sectarian origins of either day.
 
 
 40
 The legislature's consideration of earlier attempts to have Good Friday declared a public holiday are similarly devoid of sectarian influences.[14] A 1929 bill proposing establishment of Good Friday as a legal holiday was tabled because the state senate's Committee on Judiciary determined "that there are already enough legal holidays." Haw.Sen.Stand.Comm.Rep. No. 225 (Sen. Bill No. 136), reprinted in 1929 Haw.Sen.J. 727. A second bill was tabled in 1931 because "[y]our Committee sees no good reason for adding to the number of Territorial holidays now prescribed by law." Haw.Sen.Stand.Comm.Rep. No. 239 (H. Bill No. 297), reprinted in 1931 Haw.Sen.J. 803.
 
 
 41
 In 1939, the Hawaii Territorial Legislature passed a bill designating Good Friday as a public holiday. The bill was vetoed by the governor, again due to concerns about the number of holidays already recognized in Hawaii. See Governor's Veto Message, H. Bill No. 39, May 3, 1939 ("I have had many objections from business men throughout the Territory to creating additional holidays and I see no reason for adding to those which we now have."). Accompanying that bill was the following committee report:
 
 
 42
 There are now ten legal holidays in the Territory, including Thanksgiving, plus primary and general election days. Public sentiment is divided on the advisability of creating Good Friday a legal holiday. Some feel that we already have too many holidays to the detriment of both private and public business. On the other hand, others feel equally strongly that Good Friday being in theory at least a day of solemn religious observance by the members of the various churches and religious denominations should be given legal sanction. More and more churches are now conducting the three-hour service on that day and many business houses are allowing their employees to take time off for this purpose. If the legislature should feel that we should have more legal holidays than we now have, it would seem that in view of the religious significance of Good Friday observance of this day would have as much justification as Thanksgiving or Christmas.
 
 
 43
 Haw.H.Stand.Comm.Rep. No. 254 (H. Bill No. 39), reprinted in 1939 Haw.H.J. 890.
 
 
 44
 The district court concluded that a fair reading of the 1939 committee report demonstrates that the primary purpose of the bill was to have more legal holidays. We happen to agree, recognizing, of course, that this clearly secular purpose need not even be "primary" to satisfy the purpose prong. Although the passage recognizes that some people consider Good Friday to be a " 'solemn religious observance,' " the legislative purpose for the bill was that Hawaii " 'should have more legal holidays.' " Cammack, 673 F.Supp. at 1534 (quoting committee report). Read in the context of the earlier, tabled bills, the governor's veto of the 1939 bill, and the 1941 enactment, it seems clear that the statute had at least a legitimate, sincere secular purpose.
 
 
 45
 Furthermore, even to the extent that an improper purpose could be gleaned from the statute's legislative history, that would not compel a finding of improper purpose now, some fifty years later. See McGowan v. Maryland, 366 U.S. 420, 445, 81 S.Ct. 1101, 1115, 6 L.Ed.2d 393 (1961) (noting that the present purpose of Sunday closing laws is to provide a uniform day of rest for all, regardless of the religious origins of the laws). The most ardent proponents of the statute in this litigation are the labor unions who have incorporated the statutory holidays into their collective bargaining agreements with the state and local governments. This is a strong indicant that the purpose animating the challenged act is not so much state sponsorship of religion as state sensitivity to the concerns of organized labor. See id. at 435, 81 S.Ct. at 1110 (noting involvement of labor groups in passage of Sunday closing laws); Two Guys from Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582, 595, 81 S.Ct. 1135, 1142, 6 L.Ed.2d 551 (1961) (the challenged Sunday blue law "was promoted principally by the representatives of labor and business interests"); Franks v. City of Niles, 29 Fair Empl.Prac.Cas. (BNA) 1114, 1117 n. 5 (N.D.Ohio 1982) (rejecting establishment clause challenge to municipal Good Friday holiday, in part because of union involvement in selection of recognized holidays).
 
 
 46
 c
 
 
 47
 It is of no constitutional moment that Hawaii selected a day of traditional Christian worship, rather than a neutral date, for its spring holiday once it identified the need. The Supreme Court has recently identified as an "unavoidable consequence of democratic government" the majority's political accommodation of its own religious practices and corresponding "relative disadvantage [to] those religious practices that are not widely engaged in." See Employment Div. v. Smith, --- U.S. ----, 110 S.Ct. 1595, 1606, 108 L.Ed.2d 876 (1990). "[T]he government may (and sometimes must) accommodate religious practices and ... may do so without violating the Establishment Clause." Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 144-45, 107 S.Ct. 1046, 1051, 94 L.Ed.2d 190 (1987).[15] When applying the first prong of the Lemon test, the secular purpose need not be unrelated to religion; "[r]ather, Lemon's 'purpose' requirement aims at preventing the relevant governmental decisionmaker ... from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 335, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987).
 
 
 48
 In Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), the Court rejected an establishment clause challenge to a program whereby public schools released students for a limited time for off-campus religious instruction. On behalf of the Court, Justice Douglas explained that a legislative act motivated by a legitimate secular purpose is not unconstitutional simply because it accommodates the religious practices of some citizens:
 
 
 49
 When the state ... cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs.... The government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction. But it can close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction.
 
 
 50
 Id. at 313-14, 72 S.Ct. at 684. The Court explicitly rejected the view that "separation of Church and State means that public institutions can make no adjustments of their schedules to accommodate the religious needs of the people." Id. at 315, 72 S.Ct. at 684-85. The Court described such a view as "a philosophy of hostility to religion" which it could not read into the Bill of Rights. See id.; see also Gallagher v. Crown Kosher Super Market of Massachusetts, Inc., 366 U.S. 617, 627, 81 S.Ct. 1122, 1127, 6 L.Ed.2d 536 (1961) (plurality) ("But because the State wishes to protect those who do worship on Sunday does not mean that the State means to impose religious worship on all.") (citing Everson, 330 U.S. at 16, 67 S.Ct. at 511-12), cf. Lynch, 465 U.S. at 710, 104 S.Ct. at 1378-79 (Brennan, J., dissenting) ("When government decides to recognize Christmas Day as a public holiday, it does no more than accommodate the calendar of public activities to the plain fact that many Americans will expect on that day to spend time visiting with their families, attending religious services, and perhaps enjoying some respite from preholiday activities.") (citing Zorach ).
 
 
 51
 Hawaii's compliance with the spirit of Zorach favorably compares with California's improper recognition of Good Friday in Mandel v. Hodges, 54 Cal.App.3d 596, 127 Cal.Rptr. 244 (1976). In Mandel, the Governor of California ordered the closing of state offices on Good Friday between the hours of noon and 3:00 p.m. State employees were paid for the three hours of closure. The California Court of Appeal reasoned that the order "cannot plausibly be characterized as serving any 'secular purpose.' " Mandel, 54 Cal.App.3d at 612, 127 Cal.Rptr. at 254. Unlike the instant case, the time off in California coincided purposefully with the traditional time for worship. Moreover, the personnel manual explaining the reason for the Governor's order stated: " '[i]nasmuch as state offices are closed from 12:00 to 3:00 p.m. on Good Friday, employees are given these hours off for worship.' " Id. (emphasis in Mandel ). In this case, however, the employees have the entire day off, not just the three hours associated with the Christian worship period. Appellants concede that Hawaiian public employees are not encouraged in any way to use the holiday for worship.
 
 
 52
 We conclude that the Hawaii statute has a legitimate, sincere secular purpose, specifically to provide Hawaiians with another holiday, and thus is not motivated "wholly by an impermissible purpose." Kendrick, 487 U.S. at 602, 108 S.Ct. at 2570. There is nothing impermissible about considering for holiday status days on which many people choose to be absent from work for religious reasons. That the state legislature was able to accomplish its secular purpose and at the same time accommodate the widespread religious practices of its citizenry is hardly a reason to invalidate the statute. The statute satisfies the purpose prong of the Lemon test.
 
 2
 
 53
 We next consider whether the Good Friday holiday violates the second prong of the Lemon test, which requires examining whether the primary effect of section 8-1 is the advancement of religion. Lemon, 403 U.S. at 612, 91 S.Ct. at 2111. "[A]n important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval of their religious choices." School Dist. of Grand Rapids, 473 U.S. at 390, 105 S.Ct. at 3226; accord Mergens, 110 S.Ct. at 2371-72 (plurality).
 
 
 54
 In McGowan v. Maryland, the Supreme Court examined whether the Sunday Closing Laws violated the establishment clause because Sunday is predominantly the Sabbath day for Christians. See 366 U.S. at 431, 81 S.Ct. at 1108. Chief Justice Warren's opinion for the Court extensively traced the overtly sectarian origins of such laws. See id. at 431-35, 81 S.Ct. at 1108-10. As indicated earlier, the Court noted that the proponents of such laws had grown to include secular (particularly labor) organizations. See id. at 435, 81 S.Ct. at 1110. The Court concluded that such laws now had an overriding purpose and effect of establishing a uniform day of rest for the community, rather than of promoting the Christian religion. See id. at 444-45, 81 S.Ct. at 1114-15. The Court stated that "[t]he present purpose and effect of most of [the laws] is to provide a uniform day of rest for all citizens; the fact that this day is Sunday, a day of particular significance for the dominant Christian sects, does not bar the State from achieving its secular goals." Id. at 445, 81 S.Ct. at 1115.
 
 
 55
 The Sunday Closing Laws provide an apt analogy to Hawaii's ongoing sanction of Good Friday as a legal holiday. Sunday was an appropriate choice for a weekly uniform day of rest because the community to a large degree already so regarded Sunday, due to its religious significance and (no doubt) to the long tradition of Sunday Closing Laws:
 
 
 56
 Sunday is a day apart from all others. The cause is irrelevant; the fact exists. It would seem unrealistic for enforcement purposes and perhaps detrimental to the general welfare to require a State to choose a common day of rest other than that which most persons would select of their own accord.
 
 
 57
 Id. at 452, 81 S.Ct. at 1119 (internal footnote omitted). Similarly, given that the evidence in this case informs us that large numbers of Hawaiians observe Good Friday, the legislature cannot be faulted for not selecting a different spring day for a "common day of rest." Many Christians presumably will take at least part of the day off anyway, in order to attend religious services, and non-Christians have enjoyed the holiday for fifty years--the entire working life of the vast majority of the public workforce. No endorsement of religion is implicated merely because the legislature is cognizant of these truths. That the special status of Good Friday derives from its religious origin is no more relevant than Sunday's status as the Sabbath for the dominant Christian sects; "[t]he cause is irrelevant."
 
 
 58
 The traditional celebrations of Sundays which so moved the McGowan Court, such as family outings and trips to the country, see id. at 451-52, 81 S.Ct. at 1118-19, are simply the expected benefits of a uniform day of rest. Exactly the same sorts of activities occur on any widely observed public holidays (with the probable exception of Christmas, which is imbued with different rituals) and even on Saturdays. The record evidence on the impact of the Good Friday holiday in Hawaii suggests nothing inconsistent with the observations made in McGowan. For example, the Good Friday holiday has become a popular shopping day in Hawaii and businesses have benefitted from the three-day weekend created as a result of the holiday. Cammack, 673 F.Supp. at 1535-36.[16] Similarly, citizens are better able to enjoy the many recreational opportunities available in Hawaii. Id. at 1536. Such evidence indicates that Hawaii's Good Friday holiday, at least at this late date, fifty years after enactment, cannot be regarded as an endorsement of religion any more than Sunday Closing Laws may.
 
 
 59
 In fact, Hawaii's adoption of Good Friday as a legal holiday could be viewed as less "coercive" or "endorsing" of religion than the Sunday blue laws. Under Hawaii's scheme, recognition of the holiday is simply accomplished by closing the office doors; the freed employees may enjoy virtually any leisure activity imaginable. In contrast, the Sunday Closing Laws were originally designed to funnel people into Church. See, e.g., McGowan, 366 U.S. at 432, 81 S.Ct. at 1108-09 (quoting the English law applicable to the colonies at the time of the American Revolution). Thus, most leisure activities were restricted. Even at the time the laws were examined in 1961, there were many limitations on the types of establishments which could be open. See, e.g., id. at 423, 81 S.Ct. at 1103-04 (Maryland law required closure of dancing halls, opera houses, and bowling alleys); Two Guys from Harrison-Allentown, Inc., 366 U.S. at 585, 81 S.Ct. at 1136-37 (Pennsylvania's blue law "generally forbids all worldly employment, business and sports on Sunday"); Gallagher, 366 U.S. at 620, 81 S.Ct. at 1124 (Massachusetts law made "generally unlawful Sunday attendance or participation in any public entertainments except for those which are duly licensed locally, conducted after 1 p.m., and are in keeping with the character of the day and not inconsistent with its due observance"). Such Court-approved strictures would seem to broadcast the government's endorsement of the religious purpose of the sabbath, as expressed in the Fourth Commandment, in a far more obvious manner than Hawaii's simple release of its workforce to do whatever tickles the fancy.
 
 
 60
 The breadth of impact of section 8-1, on its face and by its incorporation into the collective bargaining agreements, contributes to the conclusion that the statute's effect is simply the creation of a paid leave day for many state employees and not the endorsement of religion. Christian employees are not singled out for the paid holiday.[17] Good Friday is a paid leave day for all employees covered by the collective bargaining agreements, regardless of individual beliefs. Compare Committee for Public Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (striking down program mostly benefitting parents of parochial school children) with Board of Educ. v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (permitting textbook loans to parochial school children under a program which benefits all). The paid leave is for the entire day and not only for the three hours associated with the traditional Christian observance of Good Friday. Compare Cammack, 673 F.Supp. at 1537 (no evidence in the record that public employers encourage church attendance or any other form of religious activity on Good Friday holiday) with Mandel, 54 Cal.App.3d at 612, 127 Cal.Rptr. at 254 (emphasizing limited closing period and explicit encouragement to worship in declaring an executive order closing state offices for a portion of Good Friday unconstitutional).
 
 
 61
 Another factor in measuring the effect of a governmental action which might be construed as endorsement of religion is context. See County of Allegheny, 109 S.Ct. at 3103-04. In Lynch and County of Allegheny, the issue was how far the government could go toward participating in or endorsing the religious celebration of Christmas. In each case, the Court approved the actual display of religious icons (a creche and menorah, respectively) which were suitably balanced by secular displays.
 
 
 62
 Good Friday's mere placement on the roll of public holidays, along with other important days of secular and (in some cases) religious significance, diminishes the likelihood of an "endorsing" effect. Cf. Lynch, 465 U.S. at 710 n. 16, 104 S.Ct. at 1379 n. 16 (Brennan, J., dissenting) ("It is worth noting that Christmas shares the list of federal holidays with such patently secular, patriotic holidays as the Fourth of July, Memorial Day, Washington's Birthday, Labor Day, and Veterans Day. We may reasonably infer from the distinctly secular character of the company that Christmas keeps on this list that it too is included for essentially secular reasons.") (citation to federal statute omitted). Good Friday is surrounded by patriotic and historic dates which are all selected for their importance to the citizens of Hawaii. The government's action might best be termed a mere "acknowledgment" of religion. See id. at 692-93, 104 S.Ct. at 1369-70 (O'Connor, J., concurring) (voting to uphold creche display against establishment clause challenge). Viewed in this context, it is unlikely that an observer would regard Good Friday's inclusion as an endorsement of religion. Closing state offices on that day simply acknowledges Good Friday's status as a holiday observed widely enough (and long enough) that the secular purpose of establishing a uniform day of rest is appropriately achieved by selecting it.
 
 
 63
 If Hawaii went further toward celebrating the religious elements of Good Friday, such as erecting displays concerning the crucifixion of Jesus, then the absence of secular aspects to counterbalance the religious would probably render the display (not necessarily the holiday) unconstitutional under County of Allegheny. Christmas displays are prone to establishment clause challenges because they move far beyond a simple governmental accommodation of Christians' desire to have a day to celebrate, and, without a sufficient secular context in which to place the display, cross the line into endorsement of the celebrating religion. Nothing in the display cases, however, provides support to the notion that the mere calendar recognition of such a holiday would have the effect of endorsing the religion. See, e.g., Lynch, 465 U.S. at 675-76, 104 S.Ct. at 1360-61 (describing nation's long history of recognizing Christmas and Thanksgiving holidays); id. at 710, 104 S.Ct. at 1378-79 (Brennan, J., dissenting) (recognition of Christmas as a public holiday merely accommodates the calendar of public activities to the citizenry's traditional Christmas observances). In fact, Hawaii's acknowledgment of the holiday lacks any reference whatsoever to religion, unlike the President's Thanksgiving Day proclamations. See id. at 675-76, 104 S.Ct. at 1360-61. The context of the Good Friday holiday, a minimal accommodation of the religious practices of some Hawaiians, decreases the likelihood of a public perception of endorsement.
 
 
 64
 Because the primary effect of the Good Friday holiday is secular, we cannot conclude that the holiday is unconstitutional merely because the holiday may make it easier to worship on that day for those employees who may wish to do so. "[T]he 'Establishment' Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions." McGowan, 366 U.S. at 442, 81 S.Ct. at 1113-14. Moreover " 'not every law that confers an "indirect," "remote," or "incidental" benefit upon [religion] is, for that reason alone, constitutionally invalid.' " Lynch, 465 U.S. at 683, 104 S.Ct. at 1364 (quoting Nyquist, 413 U.S. at 771, 93 S.Ct. at 2964-65). We conclude that section 8-1 satisfies the effect prong of the Lemon test.
 
 3
 
 65
 The third prong of the Lemon test requires examining whether the Hawaii statute leads to "an excessive government entanglement with religion." Lemon, 403 U.S. at 613, 91 S.Ct. at 2111 (quotation omitted). The entanglement prong seeks to minimize the interference of religious authorities with secular affairs and secular authorities in religious affairs. See L. Tribe, American Constitutional Law Sec. 14-11, at 1226 (2d ed. 1988).
 
 
 66
 Appellants argue that the entanglement prong is not satisfied because the determination of the holiday depends upon the church's calculation of when Easter occurs each year. The required contact between the state and religious bodies, in their view, amounts to excessive administrative entanglement.
 
 
 67
 Cases in which the Supreme Court has found excessive administrative entanglement often involve state aid to organizations or groups affiliated with religious sects, such as parochial schools. See, e.g., Aguilar v. Felton, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); Roemer v. Board of Public Works, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); Levitt v. Committee for Public Educ. & Religious Liberty, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); Lemon, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Administrative entanglement is also likely where religious and public employees must work closely together. See Aguilar, 473 U.S. at 412-14, 105 S.Ct. at 3237-39 (program required on-site monitoring of sectarian schools by public authorities and coordinated planning by public and sectarian figures); Walz v. Tax Comm'n, 397 U.S. 664, 674-75, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970) ("the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance"). None of these situations bear on Hawaii's presumed simple reference to an ecclesiastical calendar (or, more likely, the World Almanac) to determine the date of a public holiday.
 
 
 68
 In Lynch, the Court examined whether there was administrative entanglement between the city and the church resulting from the city's creche display. Finding that there were no direct city expenditures for the maintenance of the creche and no evidence of contact between the city and the church regarding the creche, the Court concluded that "[t]here is nothing here ... like the 'comprehensive, discriminating, and continuing state surveillance' or the 'enduring entanglement' present in Lemon." Lynch, 465 U.S. at 684, 104 S.Ct. at 1364-65 (quoting Lemon, 403 U.S. at 619-22, 91 S.Ct. at 2114-16). In the case of Hawaii's Good Friday holiday, to the extent that the actual date of the holiday would be determined by resort to church calendars, any such entanglement would surely not be the kind of "comprehensive" and "enduring" entanglement the first amendment prohibits.[18]
 
 
 69
 Appellants also contend that section 8-1 fails because its passage has resulted in political divisiveness. This divisiveness is purportedly evidenced by the attempts of nonChristian religious groups, including Buddhists and Baha'is, to have significant days in their religious calendars declared legal holidays by the state legislature.
 
 
 70
 Although political divisiveness has been considered in establishment clause cases, see, e.g., Nyquist, 413 U.S. at 796, 93 S.Ct. at 2977, it has never been relied on "as an independent ground for holding a government practice unconstitutional." Lynch, 465 U.S. at 689, 104 S.Ct. at 1367-68 (O'Connor, J., concurring); see also Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, 483 U.S. at 339 n. 17, 107 S.Ct. at 2870 n. 17 (quoting and following Lynch ). In any event, we are unpersuaded that political divisiveness occurred as a result of the Good Friday holiday. There is no showing that the nonChristian sects' attempts to have certain days declared state holidays were prompted by enactment of the Good Friday holiday. Indeed, these "controversies" appear to have occurred some two or three decades after Good Friday's declaration as a legal holiday. We cannot conclude that the enactment of section 8-1 has resulted in political divisiveness. The Hawaii statute satisfies the entanglement prong of the Lemon test.V
 
 
 71
 It is difficult to imagine that the average Hawaiian citizen would view Hawaii's inclusion of Good Friday on a list of state holidays as any more a law establishing a religion than is the current inclusion of Christmas on the same list. Cf. County of Allegheny, 109 S.Ct. at 3121 (O'Connor, J., concurring) ("The question ..., in short, is whether a reasonable observer would view such longstanding practices [including recognition of Thanksgiving as a public holiday] as a disapproval of their particular religious choices, in light of the fact that they serve a secular purpose rather than a sectarian one and have largely lost their religious significance over time.") (citing L. Tribe, American Constitutional Law 1294-96 (2d ed. 1988)); id. 109 S.Ct. at 3138 (Kennedy, J., concurring and dissenting) ("The Religion Clauses do not require government to acknowledge these holidays or their religious component; but our strong tradition of government accommodation and acknowledgment permits government to do so.").[19] The Hawaii law does not require or endorse any religious activity, and the only public expenditure associated with the holiday is the continued pay accrued by public employees. We are persuaded that nothing more is "established" by the Hawaii statute than an extra day of rest for a weary public labor-force.
 
 
 72
 AFFIRMED.
 
 D.W. NELSON, Circuit Judge, dissenting:
 
 73
 The holly and the ivy, jingling bells, red-nosed reindeer, and frosty snowmen this is not. What this case is about is Hawaii's endorsement, by means of a state holiday, of a day thoroughly infused with religious significance alone. Because I believe that such a state establishment of religion violates both the purpose and effects prongs of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), I respectfully dissent.
 
 I. PURPOSE
 A.
 
 74
 The first prong of the Lemon test requires that "the statute ... have a secular legislative purpose." Id. at 612, 91 S.Ct. at 2111. Though this seems rather straightforward, the Supreme Court has subsequently been less clear about how much secular purpose is required to satisfy the test. The critical question is whether a or any legitimate secular purpose is sufficient or whether the actual or primary purpose of the legislation must be secular. The majority believes that "a legitimate, sincere secular purpose" is sufficient. Majority op. at 776. For support, it musters the language in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), that "a secular purpose" is all that is required, id. at 681 n. 6, 104 S.Ct. at 1363 n. 6 (emphasis added), and in Bowen v. Kendrick, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), that only a statute "motivated wholly by an impermissible [i.e., religious] purpose" will fail the purpose prong. Id. at 602, 108 S.Ct. at 2570.
 
 
 75
 The majority's great reliance on these two cases, however, is troublesome in its selectivity, for the Court has also said quite a few times that more than a or any secular purpose is required. The most critical instance is Justice O'Connor's concurrence in Lynch, where she noted that the purpose prong "is not satisfied ... by the mere existence of some secular purpose, however dominated by religious purposes." Lynch at 690-91, 104 S.Ct. at 1368 (O'Connor, J., concurring).[1] Soon thereafter, a majority of the Court, in Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), adopted Justice O'Connor's Lynch language in looking to " 'whether government's actual purpose is to endorse or disapprove of religion.' " Id. at 56, 105 S.Ct. at 2489-90 (quoting Lynch at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring)) (emphasis added). Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), later quoted the exact same language concerning "actual purpose." Id. at 585, 107 S.Ct. at 2578. That opinion also mentioned the "legislature's preeminent [not "wholly"] religious purpose," id. at 590, 107 S.Ct. at 2581 (emphasis added), its "predominate religious purpose," id., the "preeminent purpose ... to advance the religious viewpoint," id. at 591, 107 S.Ct. at 2581-82, and "the Act's primary purpose." Id. at 592, 107 S.Ct. at 2582. Previously, Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), held that posting the Ten Commandments in schools violated the purpose prong despite an avowed secular purpose. See Lynch at 691, 104 S.Ct. at 1368-69 (O'Connor, J., concurring).
 
 
 76
 Even Kendrick, which is the majority's only support for its explanation of the purpose prong, see supra n. 1, cuts both ways. After initially positing a "wholly impermissible purpose" test, id. at 602, 108 S.Ct. at 2570, the Court reverses field in the penultimate sentence of its purpose section: "There is simply no evidence that Congress' 'actual purpose' in passing the AFLA was one of 'endorsing religion.' " Id. at 604, 108 S.Ct. at 2572 (citing Edwards at 589 & 594, 107 S.Ct. at 2581 & 2583) (emphasis added).[2]
 
 
 77
 Analysis of these cases thus reveals that the Supreme Court wishes courts to look to the actual or primary or predominant purpose, rather than to any legitimate secular purpose. The majority, however, does not even grapple with the dilemma of which formula to apply: any legitimate secular purpose or the actual purpose. Instead, it simply invokes the first without refuting the second. The majority thus selects a formula that effectively reads the purpose prong out of the Lemon test.
 
 
 78
 I firmly believe that "primary" or "actual" secular purpose is both the test that the Supreme Court has articulated and a far preferable formulation. If a legislature need merely come up with any secular purpose that is sincere and not a sham, we have effectively gutted this prong. For instance, a legislature could decide that a state building would be enlivened by decoration, surely a reasonable secular purpose, and then install a beautiful creche on its staircase or a decorated star of David on its lawn. Both could undoubtedly adorn otherwise dreary government buildings and thereby create an improved aesthetic appearance, but I cannot believe either would pass constitutional muster. A far more logical approach is to examine whether the central or actual purpose behind the government's actions was secular or religious.
 
 B.
 
 79
 Having determined that courts must seek out the primary purpose, the obvious place to start is the legislative history. Edwards v. Aguillard, 482 U.S. 578, 594-95, 107 S.Ct. 2573, 2582-83, 96 L.Ed.2d 510 (1987). Though I agree with the majority that the committee report on the 1939 bill is the best evidence of purpose, I cannot subscribe to the majority's exegesis of this report.
 
 
 80
 The majority believes that a reading of the long paragraph from the 1939 committee report, quoted in majority op. at 775, demonstrates that "the legislative purpose for the bill was that Hawaii should have more legal holidays." Id. at 775-776 (internal quotation omitted). I find such an interpretation baffling. The heart of this paragraph is the juxtaposition of the following two sentences:
 
 
 81
 Some feel that we already have too many holidays to the detriment of both private and public business. On the other hand, others feel equally strongly that Good Friday being in theory at least a day of solemn religious observance by the members of the various churches and religious denominations should be given legal sanction.
 
 
 82
 Haw.Bill H.Stand.Comm.Rep. No. 254 (H. bill No. 39), reprinted in 1939 Haw.H.J. 890. This excerpt makes manifest that the division was not between those who thought that there were too many holidays and those who thought there were too few. On the contrary, the division was between those who wished to create Good Friday as a legal holiday because of its religious significance and those who felt there were too many holidays. In mentioning earlier tabled bills, the majority only reinforces the theory that earlier refusals to enact Good Friday as a holiday were finally overridden by the importance of religious observances of this holy day.
 
 
 83
 The citations to the legislative history of the 1941 bill, see majority op. at 775, are similarly unhelpful to the majority. The committee report was responding to a bill proposing both Lincoln's Birthday and Good Friday as holidays. The committee "feels that Good Friday should be set aside as a legal holiday but feels that, inasmuch as Washington's Birthday is a legal holiday and falls within the short month of February, to have another holiday within that month would be inadvisable." Haw.Sen.Stand.Comm.Rep. No. 296 (H. Bill No. 154), reprinted in Haw.Sen.J. 710. This quotation makes no mention of why the committee felt Good Friday should be adopted as a legal holiday, only that dates governed the decision to reject Lincoln's Birthday. The majority thus greatly strains its inference in claiming that Good Friday's selection was dictated by calendar concerns.
 
 C.
 
 84
 Even if the primary purpose behind creating a new holiday was secular, the decision to choose the specific date of Good Friday was not. In other words, if we look at the decision in two parts--to create a holiday and then to choose a date--the second decision clearly bore a religious purpose. It is difficult to think of more perspicuous language than "in view of the religious significance of Good Friday." Rep. No. 254. Though the majority attempts to get around this, its efforts are unsuccessful. The committee report also noted that Good Friday is a "day of solemn religious observance." Id. The purpose of picking the date of the Friday before Easter was primarily motivated by religious concerns. There is no primary secular purpose for picking that date instead of any other.
 
 
 85
 The majority attempts to rebut this two-part analysis by relying on the principle of accommodation. There is no doubt that " 'the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.' " Corporation of the Presiding Bishop v. Amos, 483 U.S. 327, 334, 107 S.Ct. 2862, 2867, 97 L.Ed.2d 273 (1987) (quoting Hobbie v. Unemployment Appeals Comm'n., 480 U.S. 136, 144-45, 107 S.Ct. 1046, 1050-51, 94 L.Ed.2d 190 (1987)). However, the Supreme Court has made equally clear that "[g]overnment efforts to accommodate religion are permissible when they remove burdens on the free exercise of religion." County of Allegheny, 492 U.S. at 601 n. 51, 109 S.Ct. at 3105 n. 51 (emphasis added). See id. 492 U.S. at 631, 109 S.Ct. at 3121 (O'Connor, J., concurring) ("the government can accommodate religion by lifting government-imposed burdens on religion") (emphasis deleted); Wallace v. Jaffree, 472 U.S. 38, 57 n. 45, 105 S.Ct. 2479, 2490 n. 45, 86 L.Ed.2d 29 (1985) (no need to accommodate because "no governmental practice impeding students from silently praying."); Amos, 483 U.S. at 336, 107 S.Ct. at 2868 (accommodation allowed because Congress imposed a "significant burden on a religious organization [by] requir[ing] it ... to predict which of its activities a secular court will consider religious.").[3]
 
 
 86
 Just as County of Allegheny found no burden on Christians wishing to display creches, the evidence has not established that any exists here for those who wish to observe Good Friday in a religious manner. In that case, "Christians remain free to display creches in their homes and churches," County of Allegheny, 492 U.S. at 601 n. 51, 109 S.Ct. at 3105 n. 51, and here, Christians may take Good Friday off or seek leave to at least go worship for a few hours. To be sure, not to proclaim Good Friday a state holiday "deprives Christians of the satisfaction of seeing the government adopt their religious message as [its] own, but this kind of government affiliation with particular religious messages is precisely what the Establishment Clause precludes." Id. Without this statute, Christians would not be prohibited from honoring Good Friday; rather, the day would simply not be a public holiday.
 
 
 87
 In sum, the actual purpose of the Hawaii's bill was to "give[ ] legal sanction" to the observance of Good Friday. Rep. No. 254. Since accommodation cannot save this statute, I believe that it is clearly violative of Lemon's purpose prong and thus unconstitutional.
 
 II. EFFECTS
 
 88
 The second prong of the Lemon test requires the statute's "principal or primary effect ... [to] be one that neither advances nor inhibits religion." Id. at 612, 91 S.Ct. at 2111 (citation omitted). Justice O'Connor's concurrence in Lynch modified this somewhat, arguing that the key is "that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." Id. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring) (emphasis added). This "endorsement" test has since been adopted by the Court, as County of Allegheny has recently made clear. See id. 492 U.S. at 592-93, 109 S.Ct. at 3100 (noting cases that have used "endorsement"). The majority here, not in disagreement, uses the formula of whether the " 'challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval of their religious choices.' " Majority op. at 777 (quoting School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985)). The difficulty, I believe, is that they do not follow their own test.
 
 
 89
 The majority supports its effects section with two different arguments. The first is that this case is similar to McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), where the Supreme Court upheld the constitutionality of Sunday closing laws. The second is that by placing Good Friday in the same context as other secular holidays, the state has negated any impermissible endorsement of religion. After discussing my objections to both of these theories, I will explain why I believe this to be a clear instance of state endorsement of religion.A.
 
 
 90
 The majority's equation of McGowan with this case implies that Sundays and Good Friday at present have similar secular effect. To say these are of comparable secular magnitude is to argue that a candle and the sun are similar because they both give off light. While Sunday holds unique meaning for those of many faiths as well as those of none, Good Friday is still essentially a holiday with Christian connotations. As the majority noted in McGowan:
 
 
 91
 [I]t is common knowledge that the first day of the week has come to have special significance as a rest day in this country. People of all religions and people with no religion regard Sunday as a time for family activity, for visiting friends and relatives, for late sleeping, for passive and active entertainments, for dining out, and the like .... Sunday is a day apart from all others.
 
 
 92
 Id. at 451-52, 81 S.Ct. at 1118; see also id. at 507, 81 S.Ct. at 1179 (Frankfurter, J., concurring) ("For to many who do not regard it sacramentally, Sunday is nevertheless a day of special, long-established associations, whose particular temper makes it a haven that no other day could provide.") (emphasis added).
 
 
 93
 Good Friday, on the other hand, carries no such wide-ranging appeal. We need think only of the schoolchild who asks her teacher why she gets Sundays and Good Friday off. The answer must be that the former are days of rest and the latter a commemoration of the death of Jesus Christ. Selecting a state holiday does much more than enable citizens to relax; it communicates a critical message about the state's priorities. See, infra, section II-C. While the present effect of Sunday is not to favor one sect over another, that of Good Friday endorses Christianity. As County of Allegheny underscored:
 
 
 94
 Whatever else the Establishment Clause may mean ... it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.
 
 
 95
 Id. 492 U.S. at 605, 109 S.Ct. at 3107 (internal quotation omitted).
 
 
 96
 The majority also argues that this holiday has been ongoing for fifty years and thus may be analogized to Sunday closing laws. Yet the majority earlier admitted that the "unique history" of legislative prayer in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), did not apply to this case. Majority op. at 772. Sunday has a history far more intertwined with our nation's founding than Nebraska's legislative prayer. In fact, Sunday restrictions were in force two centuries before Nebraska even entered the union. See McGowan, 366 U.S. at 433, 81 S.Ct. at 1109. Thus if Marsh is not applicable to this case because Good Friday as a holiday has not attained the unique character of Nebraska legislative prayer, certainly McGowan cannot apply either. Furthermore, County of Allegheny points out that not "all accepted practices 200 years old and their equivalents are constitutional today." Id. 492 U.S. at 603, 109 S.Ct. at 3106. If 200 years does not necessarily suffice to sanitize an otherwise violative establishment of religion, then the fact alone that Hawaii's practice has occurred for 50 years is similarly of little value.[4]
 
 
 97
 The majority mentions, in addition, that Good Friday "has become a popular shopping day in Hawaii," majority op. at 778, and notes the economic benefits to businesses because of the holiday. I do not gainsay the remunerative nature of the holiday for business, but this is an ancillary result, not a secular effect, of any state holiday. See Lynch, 465 U.S. at 685, 104 S.Ct. at 1365 ("That the display brings people into the central city, and serves commercial interests and benefits merchants and their employees, does not ... determine the character of the display.").
 
 
 98
 Finally, to argue that Christian employees alone are not given the day off is to erect a man of material flimsier than straw. The fact that such a statute would be so patently unconstitutional does not shed any light on the present one. Christians and nonChristians alike were free to gaze upon Allegheny's creche, but that, quite obviously, did not cure the constitutional flaw.
 
 B.
 
 99
 The Court in County of Allegheny reminds us of another crucial aspect of the effects prong: context. A majority of the Court noted that under Lynch "the effect of a creche display turns on its setting. Here, unlike in Lynch, nothing in the context of the display detracts from the creche's religious message." Id. 492 U.S. at 598, 109 S.Ct. at 3103-04 (emphasis added). The menorah in County of Allegheny was linked with a tree, the creche in Lynch was placed amidst other secular symbols, and the funds in Bowen were disbursed to religious and nonreligious groups, and all were upheld as constitutional. Without any countervailing secular context, the creche in County of Allegheny was found to have violated the Establishment Clause. Here the legislature has created a "creche alone" situation in its declaration of Good Friday as a state holiday. No secular mitigating factors appear to lend context to this decision or to offset the religious nature of this day.
 
 
 100
 The majority's context argument is that Good Friday's placement on the roll of public holidays amidst secular days diminishes its endorsing effect. Majority op. at 779-780. The context, in other words, is the list of holidays. Such an argument cannot be maintained. This is equivalent to saying that if the state erected secular displays on assorted sites, this would balance a creche on another site. Just as the context in that example should not be all displays anywhere in the state or even city, the context here cannot be all holidays, regardless of how temporally far apart.[5] Furthermore, under the majority's context rationale, the state could decide tomorrow that all of holy week or any of the numerous saints' days should be holidays and that their placement on the holiday roll would be balanced by all the other secular holidays. It seems that the majority would support as a state holiday any uniquely religious day on the grounds that because it is a state holiday, it must be of primarily secular content. A greater switch in cause and effect is difficult to imagine. The reason that the holiday roll is filled with patriotic and secular days is because the state may not make any laws respecting the establishment of religion.[6]
 
 
 101
 The majority's other point in its discussion on context is that a state's "mere calendar recognition" of a religious holiday is less of an endorsement of religion than public displays of religious symbols. Majority op. at 780. This argument is no more tenable than the last. "Mere calendar recognition" is a euphemism for "state-declared holiday." The majority believes that the state's declaration of a public holiday and its closing of state offices on a purely religious day is somehow less of an endorsement of Christianity than is the erection of a crucifix on state property, and it notes that the display cases have not held to the contrary. Those cases, though, have never discussed the constitutionality of state declarations of purely religious days as public holidays. I believe that such an establishment of religion is clearly more offensive than state decorations with religious themes.
 
 C.
 
 102
 Overall, I cannot believe that the establishment of Good Friday as a state holiday can survive the endorsement test. As Justice O'Connor stressed in her County of Allegheny concurrence,
 
 
 103
 If government is to be neutral in matters of religion, rather than showing either favoritism or disapproval towards citizens based on their personal religious choices, government cannot endorse the religious practices and beliefs of some citizens without sending a clear message to nonadherents that they are outsiders or less than full members of the political community.
 
 
 104
 Id. 492 U.S. at 627, 109 S.Ct. at 3119 (O'Connor, J., concurring). In this case, the legislature sends the message to nonChristians that it finds Good Friday, and thus Christianity, to be a religion worth honoring, while their religion or nonreligion is not of equal importance. In fact, the government promotes Western Christians above Eastern Christians, whose Easter and Good Friday almost always fall on different dates. By declaring Good Friday a holiday, the state places its imprimatur on both the Christian rites and practices observed on that day and to Western Christianity in general. No other state holiday in the calendar bears anywhere near the religious implications of Good Friday, with the exception of Christmas, whose religious and secular traditions are intertwined. See infra section IV. Hawaii's benefit to religion is not "indirect," "remote," or "incidental," see Lynch at 683, 104 S.Ct. at 1364; on the contrary, it is an open and obvious bestowal of approval on a critical religious day for Western Christians.
 
 
 105
 To order time and mark its passing are unique means by which communities define themselves. In selecting particular state holidays, the polity does more than honor the past; it identifies the people, events, and values from which it draws inspiration and seeks guidance. The celebrations provide a sense of continuity with remote times, bestowing upon the present the virtues of the past. Hawaii's decision, therefore, should not be dismissed as a bagatelle or applauded simply because it provides an additional day of repose; on the contrary, it should be regarded as a weighty, solemn statement, at once reflecting and shaping the collectivity's character.
 
 
 106
 The majority, I fear, underestimates the importance of such decisions. And yet, we are reminded daily of their role and significance to people around the globe. The French Jacobins are perhaps the most apt example in their swift introduction of their own calendar, which bore new names for months and even dated their accession to power as Year I. In the Third World, victorious revolutionary movements are quick to solemnize historical dates: e.g., November 1st in Algeria, July 26th in Cuba. At this very moment we wonder how long October 17th will remain a national holiday in the Soviet Union. Indeed, the majority need not have searched so far in time or space, as fierce debates over the celebration of Martin Luther King Day attest to our own extreme sensitivity to this issue.
 
 
 107
 There is, as I have explained, good reason for such emotional reactions. By honoring a given day, the state endorses an event as a fair reflection of its beliefs; it establishes that event as a privileged repository of its values. Despite the potential for impassioned disputes, a state is free to do this as far as secular occurrences are concerned--hence the 4th of July, Presidents' Day, Labor Day, or Memorial Day. But the First Amendment must exclude from this list those days that are remembered for their religious significance alone. Today, and with the blessing of the majority, we are told that it need not. I believe that by declaring Good Friday a state holiday, Hawaii has endorsed a day thoroughly infused with religious meaning; such endorsement has
 
 
 108
 [t]he effect on minority religious groups, as well as on those who may reject all religion, ... [of conveying] the message that their views are not similarly worthy of public recognition nor entitled to public support. It was precisely this sort of religious chauvinism that the Establishment Clause was intended forever to prohibit.
 
 
 109
 Lynch at 701, 104 S.Ct. at 1374 (Brennan, J., dissenting) (emphasis added) (internal footnote omitted). I am unable to countenance such an endorsement.
 
 III. ENTANGLEMENT
 
 110
 Lemon's third prong states that "the statute must not foster an excessive government entanglement with religion." Id. at 613, 91 S.Ct. at 2111 (internal quotation and citation omitted). Though I am troubled by the necessity of having the Western Christian Church dictate the date of a state holiday each year, I would probably concur with the majority that this is not the sufficiently enduring entanglement required to invalidate the law. Further, while I am also concerned by the political divisiveness engendered by such a law, since Buddhists and others have sought to have their religious holidays similarly honored, I also agree with the majority that this is not sufficient alone to overturn the holiday's establishment. I do not agree, however, that the timing of other religious groups' efforts to enact other state holidays is at all dispositive. In any event, since I would overturn the law on either the purpose or effects prongs, I will not venture to say whether the combination of the date and the political divisiveness would suffice to create political entanglement.
 
 IV. GOOD FRIDAY, CHRISTMAS, AND THANKSGIVING
 
 111
 The district court made the additional effort to show that Good Friday is of a similarly secular nature as Christmas and Thanksgiving. Cammack v. Waihee, 673 F.Supp. 1524, 1539 (D.Hawaii 1987) ("this court concludes that Good Friday and Christmas stand on equal footing before the First Amendment"). It is true that the majority does not "accept the contention" that the observance of Good Friday has become secularized to the same extent as celebrations of Christmas and Thanksgiving. Majority op. at 782 n. 19. Yet it still notes that the average Hawaiian would view the inclusion of Good Friday as a holiday as no more of an establishment of religion than Christmas, id. at 781, relies on Thanksgiving and Christmas as religious holidays in its context section, id. at 780, and makes other analogies between Christmas and Good Friday as religious holidays. Id. at 780. Because I strongly disagree with the theory that Good Friday may be compared in its religious and secular makeup with Thanksgiving and Christmas, I add this section.
 
 
 112
 First and foremost, I do not think that the Supreme Court agrees either. For example, "[a]s observed in this Nation, Christmas has a secular as well as a religious dimension." County of Allegheny, 492 U.S. at 579, 109 S.Ct. at 3093 (footnote omitted). In fact, "[i]t has been suggested that the cultural aspect of Christmas in this country now exceeds the theological significance of the holiday." Id. at n. 3. Justice O'Connor has noted, "[T]he celebration of Thanksgiving as a public holiday, despite its religious origins, is now generally understood as a celebration of patriotic values rather than particular religious beliefs." Id. 492 U.S. at 631, 109 S.Ct. at 3121 (O'Connor, J., concurring). Justice O'Connor continued, "Christmas is a public holiday that has both religious and secular aspects ..." Id. 492 U.S. at 633, 109 S.Ct. at 3122 (O'Connor, J., concurring). See also Lynch (Christmas "has very strong secular components and traditions." Id. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring)).[7]
 
 
 113
 Though the Court has not mentioned Good Friday, it has spoken on Easter: "The Easter holiday celebrated by Christians may be accompanied by certain 'secular aspects' ... but it is nevertheless a religious holiday." County of Allegheny, 492 U.S. at 633, 109 S.Ct. at 3122 (O'Connor, J., concurring). If Easter, the Easter Bunny notwithstanding, is still in essence a religious holiday, what does that say about Good Friday? Simply stated, Good Friday has no secular symbols or accompanying secular celebration.
 
 
 114
 On one side of the holiday ledger we may place secular symbols: stockings, Santa Claus, elves, reindeer, and pilgrims, Native American maize, turkey, and cranberry; on the other side we place religious symbols: creches, menorahs, palms, and crucifixes. While Good Friday is associated with the religious symbol of Jesus Christ on the cross, it is, very much unlike Thanksgiving and Christmas, associated with no secular symbols at all. In fact, I think that we would insult observing Christians by characterizing Good Friday, a solemn day of worship and reflection on the death of Jesus Christ, as a day of convivial secular celebration. Easter, perhaps because it is a celebration of Jesus' resurrection, does have some secular components such as egg hunts and chocolate bunnies, and may, in this fashion, begin to approach Thanksgiving and Christmas. Good Friday, bereft of secular symbols or joyous festivity, simply does not belong in the same category. Indeed, while the death of Jesus Christ dominates Good Friday, for many, the reigning images of Christmas are the secular Ghosts of Christmas Past, Present, and Yet to Come.
 
 
 115
 Another telling example is that people of many religions or of no religion at all celebrate Thanksgiving and even Christmas, but it would be difficult to find atheists, Jews, or Baha'is engaging in Good Friday commemorations. Christmas, indeed, may be seen as a whole season, which the man who is perhaps its greatest secularizer described as "a good time; a kind, forgiving, charitable, pleasant time; the only time I know of, in the long calendar of the year, when men and women seem by one consent to open their shut-up hearts freely, and to think of people below them as if they really were fellow-passengers to the grave, and not another race of creatures bound on other journeys." Dickens, A Christmas Carol 8-9 (Bantam ed. 1986). To say that such an ecumenical spirit pervades Good Friday is simply untenable. I must agree that there is no evidence that "the Christian holy day of Good Friday has become secularized in any degree during the course of its longtime observance by Christian sects." Mandel v. Hodges, 54 Cal.App.3d 596, 612, 127 Cal.Rptr. 244 (1976). Indeed, "the passage of time has not converted Good Friday into a secular holiday or freed it of its clearly religious origins." Griswold Inn, Inc. v. State, 183 Conn. 552, 441 A.2d 16, 21 (1981) (holding state law banning liquor sales on Good Friday unconstitutional).
 
 
 116
 I find this equation of Good Friday with Christmas and Thanksgiving both distasteful to practicing Christians, who do not wish a serious day permeated by mirth and levity, and unsettling to adherents of other religions or nonreligious persons, who would not desire their secular celebrations of Thanksgiving and Christmas to be linked to a holiday they could not imagine honoring.
 
 
 117
 I, therefore, respectfully dissent.
 
 
 
 [1]
 Section 8-1 in its entirety provides as follows:
 Sec. 8-1 Holidays designated. The following days of each year are set apart and established as state holidays:
 The first day in January, New Year's Day;
 The third Monday in January, Dr. Martin Luther King, Jr., Day;
 The third Monday in February, Presidents' Day;
 The twenty-sixth day in March, Prince Jonah Kuhio Kalanianaole Day;
 The Friday preceding Easter Sunday, Good Friday;
 The last Monday in May, Memorial Day;
 The eleventh day in June, King Kamehameha I Day;
 The fourth day in July, Independence Day;
 The third Friday in August, Admission Day;
 The first Monday in September, Labor Day;
 The eleventh day in November, Veterans' Day;
 The fourth Thursday in November, Thanksgiving Day;
 The twenty-fifth day in December, Christmas Day;
 All election days, except primary and special election days, in the county wherein the election is held;
 Any day designated by proclamation by the President of the United States or by the governor as a holiday.
 Haw.Rev.Stat. Sec. 8-1 (Supp.1989).
 
 
 [2]
 See Public Serv. Co. v. Catron, 98 N.M. 134, 135, 646 P.2d 561, 562 (1982) (construing N.M.R.App.P. 23(a) (Civ.)); Del.Code Ann. tit. 1, Sec. 501 (Supp.1988); Fla.Stat.Ann. Sec. 683.01(1)(h) (West 1990); Ga.Code Ann. Sec. 1-4-1(a) (authorizing Governor to declare April 26 a state holiday or substitute in another traditional day of worship); Ind.Code Sec. 1-1-9-1(a) (Supp.1990); La.Rev.Stat.Ann. Sec. 1:55 E. (1)(a) (West Supp.1990); Md.Ann.Code art. 1, Sec. 27(a)(6) (Supp.1990); N.J.Stat.Ann. Sec. 36:1-1 (West Supp.1990); N.C.Gen.Stat. Sec. 103-4(a)(8) (Supp.1990); N.D.Cent.Code Sec. 1-03-01(4) (1975); Tenn.Code Ann. Sec. 15-1-101 (1987); Wis.Stat.Ann. Sec. 895.20 (West Supp.1989). The New York Stock Exchange also adjourns for Good Friday. See 50 Fed.Reg. 41,283 n. 3 (1985) (noting proposal to open on Good Friday)
 
 
 [3]
 Because the parties have not briefed the point, we express no opinion on the efficacy of bringing an establishment clause challenge under section 1983. We note that this route has been traveled before without exciting controversy (or even comment). See, e.g., Marsh v. Chambers, 463 U.S. 783, 785, 103 S.Ct. 3330, 3332-33, 77 L.Ed.2d 1019 (1983) (simply noting that establishment clause challenge was brought under section 1983); ACLU v. County of Allegheny, 842 F.2d 655, 656-57 (3d Cir.1988) (same), aff'd in part and rev'd in part, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). Presumably, a successful challenge here would result in an award of attorney fees. See 42 U.S.C. Sec. 1988 (1988)
 
 
 [4]
 It appears that the protections afforded by both are co-extensive. See Koolau Baptist Church v. Department of Labor, 68 Haw. 410, 718 P.2d 267 (1986) (applying first amendment establishment clause Lemon test to claim brought under state and federal constitutions); Op.Haw.Att'y Gen. No. 85-25 (Nov. 15, 1985) (analyzing validity of state license of church-sponsored day care programs under the Lemon test). Compare U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion") with Haw. Const. art. I, Sec. 4 ("No law shall be enacted respecting an establishment of religion"). In general, Hawaiian courts resolving cases involving religious freedoms look to first amendment principles and authorities. See, e.g., Dedman v. Board of Land & Natural Resources, 69 Haw. 255, 740 P.2d 28 (1987), cert. denied, 485 U.S. 1020, 108 S.Ct. 1573, 99 L.Ed.2d 888 (1988); State v. Andrews, 65 Haw. 289, 651 P.2d 473 (1982); Medeiros v. Kiyosaki, 52 Haw. 436, 478 P.2d 314 (1970); State v. Blake, 5 Haw.App. 411, 695 P.2d 336 (1985). The state's high court also relies upon first amendment jurisprudence to resolve free speech claims brought under the state constitution. See, e.g., State v. Hawkins, 64 Haw. 499, 643 P.2d 1058 (commercial speech), cert. denied, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982); State v. Bloss, 64 Haw. 148, 637 P.2d 1117 (1981) (same), cert. denied, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982); State v. Bumanglag, 63 Haw. 596, 634 P.2d 80 (1981) (pornography); State v. Manzo, 58 Haw. 440, 573 P.2d 945 (1977) (same); Cahill v. Hawaiian Paradise Park Corp., 56 Haw. 522, 543 P.2d 1356 (1975) (defamation)
 
 
 [5]
 The government also argues that the district court improperly declined to abstain from deciding this case. Abstention in some instances may be appropriate. See Burdick v. Takushi, 846 F.2d 587, 588 (9th Cir.1988) (abstention is warranted when proper resolution of the state law question at issue is uncertain; a definitive ruling on the state issue potentially obviates the need for constitutional adjudication by the federal courts; the complaint touches upon a sensitive area of social policy). However, abstention from exercising federal jurisdiction is the exception. See Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) ("The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.") (quotation omitted). Here, there appears to be no likelihood of a different result under the state constitution's establishment clause. See supra note 4; see also Cammack, 673 F.Supp. at 1528-29 (finding no likelihood of a different result)
 
 
 [6]
 There is no distinction between "defendants" or "plaintiffs" for the purposes of becoming "appellants" before this court
 
 
 [7]
 Even if we were to read the notice of appeal more narrowly, the designation of "Nell A. Cammack" in the caption would be sufficient to preserve her appeal. See National Center for Immigrants' Rights, Inc., 892 F.2d at 816 n. 2
 
 
 [8]
 In Grove v. Mead School District No. 354, 753 F.2d 1528 (9th Cir.), cert. denied, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985), an establishment clause case, we observed that the United States Supreme Court had at least recognized different rules regarding federal, state, and municipal taxpayer standing in various settings. See id. at 1532. We did not take that opportunity to compare the Doremus requirement of a pocketbook injury for state taxpayer standing and the Frothingham requirement of a municipal expenditure for municipal taxpayer standing. Id
 
 
 [9]
 In this portion of the opinion, which was otherwise written for an unanimous eight-justice Court, Justice Kennedy was able to garner only four votes; the other four justices expressly disavowed Justice Kennedy's discussion of the injury aspect of state taxpayer standing. See 109 S.Ct. at 2053-54 (Brennan, J., concurring). In Bell v. City of Kellogg, 922 F.2d 1418 (9th Cir.1991), we implied some sympathy toward Justice Kennedy's views. See id. at 1423 (citing Justice Kennedy's opinion for state taxpayer standing principles). However, we also made clear that Hoohuli remained the controlling circuit precedent. See id. (citing Hoohuli). Bell should not be interpreted as altering the law of this circuit on state taxpayer standing
 
 
 [10]
 Our conclusion renders consideration of other possible bases for standing--the denial of access to state facilities and services, some plaintiffs' status as public employees--unnecessary
 
 
 [11]
 Although the Lynch Court insisted that it was not confined to the Lemon test in analyzing establishment clause cases, see 465 U.S. at 679, 104 S.Ct. at 1362, in fact in only one such case over the past twenty years has the Court failed to apply it: Marsh v. Chambers. See also Larson v. Valente, 456 U.S. 228, 252-55, 102 S.Ct. 1673, 1687-89, 72 L.Ed.2d 33 (1982) (applying one prong of Lemon test after stating that its application "is not necessary to the disposition of the case before us")
 
 
 [12]
 The dissent criticizes our reliance upon Kendrick in discerning the correct formulation of this prong of the Lemon test. Kendrick is both the most recent Supreme Court establishment clause case examining the purpose prong, and the only case since Lynch which addressed competing secular and sectarian purposes. Nowhere in Kendrick is there even a hint that the Court was searching for a primary purpose
 When, in contrast to the situation which we face here, only one legislative purpose animates a governmental act, then it is sound to evaluate such "actual" purpose. In the cases cited by the dissent to justify an "actual" purpose analysis, the Court was faced with no legitimate secular purpose whatsoever, and understandably focused upon the legislature's one "actual" purpose. See Edwards, 482 U.S. at 585-89, 107 S.Ct. at 2578-81; Wallace, 472 U.S. at 56-60, 105 S.Ct. at 2489-92; Stone v. Graham, 449 U.S. 39, 41, 101 S.Ct. 192, 193-94, 66 L.Ed.2d 199 (1980) (per curiam).
 
 
 [13]
 The dissent's fear that our formulation of the purpose test "effectively gut[s] this prong," see Dissent at 783, is misplaced. The dissent worries that a creche or star of David could be installed on government buildings for the legitimate, secular purpose of aesthetics, and thus presumably would survive the first Lemon prong. This is no objection to the Kendrick formulation of the purpose prong. For one thing, even under the dissent's version of the test, if aesthetics were the "primary" purpose behind the legislature's actions, the display would pass the dissent's test as well. More to the point, the display would almost certainly fall on the second, "effects" prong of the Lemon test, described below. See County of Allegheny, 109 S.Ct. at 3103-05, 3112-15 (determining constitutionality of creche and menorah displays on "effects" prong). A three-pronged test need not be recrafted simply because one may hypothesize an unconstitutional act which survives one of the prongs
 
 
 [14]
 Although the earlier bills did not become law, their legislative history is relevant as the history of the 1941 bill which enacted Good Friday as a legal holiday. See Edwards, 482 U.S. at 594, 107 S.Ct. at 2583
 
 
 [15]
 This and the cases which are discussed below make clear that "accommodation" is not a principle limited to "burdens on the free exercise of religion," despite Justice Blackmun's remark suggesting the contrary in County of Allegheny. See 109 S.Ct. at 3105 n. 51. The County of Allegheny footnote does not purport to describe the outer limits of permissible accommodation
 
 
 [16]
 The potential effect on business of a Good Friday holiday was very much on the legislature's mind in considering establishment of the holiday. See Haw.H.Stand.Comm.Rep. No. 254 (H. Bill No. 39), reprinted in 1939 Haw.H.J. 890 (noting that some believed that too many holidays had a detrimental impact on business, but that many businesses were releasing employees to attend Good Friday services anyway)
 
 
 [17]
 In Zorach, the Court upheld a program under which public school students who wished to partake in religious instruction were released from class, for a limited time, to do so, although students who did not receive such instruction were required to remain at their public school. See 343 U.S. at 308-09, 72 S.Ct. at 681-82. No classroom studies were conducted for the remaining students during the release time period. Id. at 309, 72 S.Ct. at 681-82. Thus, it does not appear necessary to the constitutionality of a program under the establishment clause that the program impact adherents and nonadherents equally
 
 
 [18]
 Nor are we persuaded by the reasoning of the Connecticut Supreme Court in Griswold Inn, Inc. v. Connecticut, 183 Conn. 552, 441 A.2d 16 (1981). Although the court found that excessive entanglement existed because Good Friday's actual date is determined by ecclesiastical calendars, the court also was faced with a significant additional wrinkle. In the challenged statute, Connecticut had banned the sale of liquor on Good Friday only. Thus, the state was forced to monitor alcohol sales on Good Friday and, in effect, "enforce observance of a religious holiday" by liquor licensees. 441 A.2d at 22. There is no such entanglement in Hawaii's simple closure of state offices
 
 
 [19]
 We do not accept the contention that the observation of "Good Friday" in the Western Christian world has become "secularized" in the same manner as Thanksgiving and Christmas celebrations have become in this country. Rather, we do not regard the distinction as constitutionally significant. What the Lemon test requires is that we inquire into the purpose and effect of Hawaii's recognition of this holiday. Hawaii's recognition of Good Friday as a public holiday, we conclude, is sufficiently focused toward its secular purpose and, after 50 years, has resulted in secular effects such that an objective observer, "acquainted with the text, legislative history, and implementation of the statute," Wallace, 472 U.S. at 76, 105 S.Ct. at 2500 (O'Connor, J., concurring), would not consider the day's recognition an endorsement of religion. See Comment, Endorsing the Supreme Court's Decision to Endorse Endorsement, 24 Colum.J.L. & Soc.Probs. 1, 17-18 (1990) (noting that the passage of time dulls any message of endorsement because of the significance of a change in status quo; "when a reasonable observer judges a government action, the tradition or novelty of the act is central to his or her analysis"); see also Walz, 397 U.S. at 677-78, 90 S.Ct. at 1415-16 (stressing significance of long history of tax exemptions for religious organizations in weighing their constitutionality). The dissent's preoccupation with the differences between Christmas and Thanksgiving on the one hand, and Good Friday on the other, inevitably succumbs to tautology
 
 
 [1]
 It is noteworthy that Justice O'Connor provided the fifth vote for the Lynch majority. Therefore, since her concurrence explicitly rejects the notion that any secular purpose will do, the majority's cite of Lynch on this point is not a cite to a majority holding. The majority, then, is left only with Kendrick for support
 
 
 [2]
 In its most recent case on the Establishment Clause, which obviously postdates Kendrick, the Court's liberal quoting from Justice O'Connor's Lynch concurrence makes it clear that the Court continues to adopt that reasoning. See County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 593-94, 109 S.Ct. 3086, 3100-01, 106 L.Ed.2d 472 (1989)
 
 
 [3]
 The majority argues that "[t]he County of Allegheny footnote does not purport to describe the outer limits of permissible accommodation." Majority op. at 776 n. 15. Since they have come up with no cases that push that limit further, their proposition is mere speculation and can hardly help us in this case
 Further, the discussion of Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), is unavailing. Zorach was decided before the Lemon test was articulated and has never been cited since by a majority of the Court on the issue of accommodation. Justice Kennedy in dissent in County of Allegheny relies on Zorach for an accommodationist argument, see 492 U.S. at 658, 109 S.Ct. at 3135 (Kennedy, J., concurring in part and dissenting in part), but the present case represents no more of an example of accommodation than did the creche display.
 
 
 [4]
 Marsh and McGowan are cases that are largely based on particular laws' history being intertwined with the state's secular life. Good Friday should not receive similar judicial dispensation, for while "[t]here have been breaches of this command ["that one religious denomination cannot be officially preferred over another"] throughout this Nation's history, ... they cannot diminish in any way the force of the command." County of Allegheny, 492 U.S. at 605, 109 S.Ct. at 3107
 
 
 [5]
 Even were we to buy into this dubious notion that the holiday roll should be the context, Good Friday is not aided. In such a circumstance, the only holidays with any religious origin--Thanksgiving, Christmas, and Good Friday--all belong to the Christian faith. Even Justice Kennedy, who thought that both displays in County of Allegheny were constitutional, agrees:
 [I]f a city chose to recognize, through religious displays, every significant Christian holiday while ignoring the holidays or all other faiths, the argument that the city was simply recognizing certain holidays celebrated by its citizens without establishing an official faith or applying pressure to obtain adherents would be much more difficult to maintain.
 County of Allegheny, 492 U.S. at 664 n. 3, 109 S.Ct. 3139 n. 3 (Kennedy, J., dissenting).
 
 
 [6]
 The textual sentence that precedes Justice Brennan's footnote that the majority cites, see majority op. at 780, states that "it is clear that the celebration of Christmas has both secular and sectarian elements." Lynch, 465 U.S. at 710, 104 S.Ct. at 1378-79 (Brennan, J., dissenting). His point is that because Christmas is secular, it is on the list of holidays. The footnote admittedly proves the obverse by saying that we may infer its secular context from the company it keeps. Id. at 710 n. 16, 104 S.Ct. at 1378-79 n. 16. The ultimate point, however, is that Justice Brennan does not state or imply that simple inclusion on the holiday roll confers secularity
 
 
 [7]
 See also American Civil Liberties Union v. City of St. Charles, 794 F.2d 265, 271 (7th Cir.1986), where Judge Posner explained:
 Christmas is a national holiday, celebrated by nonobservant Christians and many nonChristians, as well as by believing Christians. It owes its status, in part anyway, to the fact that most Christmas symbology either is unrelated to Christianity or is no longer associated with it in popular understanding. There is nothing distinctively Christian about reindeer, Santa Claus, gift-giving, eggnog, tinsel, toys, retail sales, roast goose, or the music (as distinct from the words) of Christmas carols.